**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **No. 2-26CR-106-Z** |
| | § | |
| **JEREMIAH JOSEPH PAUL** | § | |

# MOTION TO SUPPRESS WITH BRIEF IN SUPPORT

Defendant JEREMIAH JOSEPH PAUL asks this Court to suppress evidence obtained from an unreasonable search and seizure on August 30, 2026. In support of this Motion, Mr. Paul shows the Court the following:

## BACKGROUND

On Sunday, August 30, 2026, at around 12:41 PM, Texas Department of Public Safety Trooper Ruben Nunez ("the Trooper") stopped a white Ford F-350 pickup driven by Jeremiah Paul on eastbound Interstate 40 near mile marker 28 in Oldham County, Texas. (Ex. A, Report at 6)[1]. The Trooper told Mr. Paul he had been stopped for two reasons: he was "running 80" in a 75-mile-per-hour zone, and the truck was missing its mud flaps. (BWC 01:44-01:51).[2] The Trooper asked for Mr. Paul's license and insurance. (BWC 01:51-01:54). Mr. Paul explained that the truck belonged to a family member and handed over the vehicle paperwork, his driver's license, and

[1] Mr. Paul notes that the Trooper's written report is incomplete because several of its paragraphs are not visible on the document provided. This is no fault of the Government's and counsel is working with the Government to obtain a complete copy of the report.

[2] This Motion cites three recordings produced in discovery: Trooper Nunez's body-worn camera ("BWC"), his interior-facing in-car camera ("ICC"), and his exterior-facing dash camera ("DC"). Citations are to elapsed time within each produced clip, not to time of day. Mr. Paul will offer all three recordings as exhibits at the hearing.

proof of insurance. (BWC 01:58-02:14; Ex. A, Report at 6, ¶¶ 2-4). Those documents listed the truck's owner and insured as Schuyler Dunn, Mr. Paul's cousin, whom he would identify by name, unprompted, minutes later. (Ex. A, Report at 6-7, ¶¶ 4, 7).

After learning that Mr. Paul was from Los Angeles, and within seconds of collecting the documents, the Trooper told Mr. Paul that he'd be issuing a warning: "I'll tell you what … since you're not from here I'll write you a warning, let's just make sure we get that handled." (BWC 02:17-02:28). The Trooper then instructed Mr. Paul to raise his windows and "come sit with me" in the patrol car. (BWC 02:29-02:33). As the Trooper walked back to the patrol car, in what was an early nonverbal indication of his true purpose, he bent down and visually inspected the inside of Mr. Paul's rear right wheel well. (BWC 02:36-02:41; DC 04:08-13).

Once Mr. Paul was in the patrol car, the trooper did not issue a warning. Instead, he opened with, "What do you have going on?" (BWC 03:21), and spent the next several minutes questioning Mr. Paul about matters having nothing to do with his speed or mud flaps: where he was going, who his cousins were, who owned the truck and how she was related to him, where he had picked up the truck, what he did for work, why he had the truck, how long he had been in California, and when he had to be back at work. (BWC 03:21-05:51). Mr. Paul answered every question. He explained that he was born in Los Angeles; that he had family in Oklahoma and Kansas; that he had picked up the truck in Kansas from his cousin; that his family owned a trucking business and property in Kansas; that he helped with the family business; that he did not own a vehicle; and that he had gone to California because his girlfriend's grandfather had died and he had stayed with her for "not that long, probably like a couple of weeks or something." (BWC 03:21-05:55).

The Trooper then asked whether Mr. Paul had ever been arrested. (BWC 05:57-59). Mr. Paul admitted that he had, for "robbery … and stuff." (BWC 06:00-06:06). The Trooper next told

Mr. Paul that his account "doesn't make sense," because "most people, they have a job and they got to go to a job and they got a certain timeline they need to be somewhere," and Mr. Paul's flexible work for his family was "not normal." (BWC 06:52-07:23). He asked whether Mr. Paul was "transporting anything illegal" and whether he had ever been "arrested for possession." (BWC 07:34-07:41). Mr. Paul said no to both, adding, "I've not been doing anything wrong." (BWC 07:40-07:43). The trooper then asked where in California Mr. Paul had stayed; Mr. Paul explained that he stayed in a family home in Las Angeles owned by his father. (BWC 07:49-08:06). The Trooper then paused his questioning to type into his squad-car computer. (BWC 08:10-09:40).

Beginning at the 09:42 mark, the Trooper restated his decision to issue Mr. Paul a warning: "So what I'm going to do, what's going to happen today, you're going to receive a warning for the speed, you're also going to receive a warning for not having mud flaps." (BWC 09:42-09:50). Only after that announcement does the recording capture the Trooper radioing dispatch to run a check on Mr. Paul. (BWC 10:12-10:27).[3] The Trooper then told Mr. Paul that "that Kansas registration is not coming back." (BWC 10:41-10:43). When Mr. Paul offered to make a phone call to gather or confirm the information the Trooper sought, the Trooper told him not to. (*See* BWC 10:50-10:55).

The Trooper did not issue the warnings. Instead, he asked more questions about Mr. Paul's family's trucking business: how many trucks it had and what it typically hauled. (BWC 11:04-11:29). After a period of silent typing, the Trooper asked Mr. Paul whether he had weapons, drugs, or large amounts of currency in the truck; Mr. Paul said no. (BWC 13:42-13:50). Beginning at the 14:15, dispatch reported that Mr. Paul had criminal history out of California, including "[m]ultiple

[3] The Trooper's report states that he noticed Mr. Paul's drug charges "[w]hile running a check on his history." (Ex. A, Report at 7, ¶ 14). The report does not say when, or by what means, that check was run. The Government bears the burden of establishing when each records check was initiated and returned.

drug charges" and "firearms and assault charges." (BWC 14:15-14:42). Neither the radio report nor the Trooper's report says when any of those charges arose or how any of them was resolved.

The Trooper then turned openly to drug interdiction. "Let me ask you a question: a lot of things that happen on this road," he told Mr. Paul, "Is people who are transporting narcotics for financial gain. Are you doing anything like that today?" Mr. Paul answered, "No, sir." (BWC 15:19-15:28). The Trooper asked, "May I search your vehicle and all its contents?" (BWC 15:34-15:36). Mr. Paul pointed out that this was a traffic stop and that he was "supposed to get a ticket and go." (BWC 15:46-15:47). The Trooper replied, "You're going to get a warning. But that's why I'm asking you for consent to search, yes or no?" Mr. Paul said no. (BWC 15:47-15:53). At this time, the Trooper still had Mr. Paul's license in his possession, having placed it in some papers the Trooper held in his left hand. (*See* BWC 14:50).

The Trooper next printed off which appears to be the warning ticket and placed it in his left hand, with Mr. Paul's other papers and driver's license, away from Mr. Paul. (BWC 15:58-16:03). Seconds later, the Trooper radioed dispatch: "I'm going to have a refusal at the 28. If you have an available K9, can you send him my way, please?" (BWC 16:12-16:20). After two minutes of silence between the Trooper and Mr. Paul, the Trooper placed Mr. Paul's papers, license, and the warning ticket on the dash in front of the Trooper, outside of Mr. Paul's reach. (BWC 18:17-18:22). After another minute of silence, the Trooper told Mr. Paul, "I called a K9. So we're going to have a K9 come and do an air sniff around your truck." (BWC 19:13-19:19). The Trooper then picked up the papers and said he was going to "verify this VIN," paused, and then decided against it: "You know what, I'll just verify it when they get here." (BWC 19:22-19:45). In other words, the one traffic-related task the Trooper could possibly still point to, although not of the sort that courts have embraced as routine, he expressly postponed until the dog arrived. Meanwhile, when

dispatch updated him on the location of the hit-and-run tractor-trailer, the trooper responded, "I'm not sure that I'll be able to catch them." (BWC 20:09-20:33).

Dispatch did not report that a canine unit was even en route until about seven minutes after the Trooper's request. (BWC 23:02-23:25). As they waited for the K-9, the Trooper kept investigating narcotics, asking whether the truck had been "wrecked or had any kind of maintenance done to it." (BWC 23:50-23:58). By that point, Mr. Paul had been held more than fourteen minutes after the Trooper announced the warnings in the squad car (BWC 09:42-09:50), and more than twenty-one minutes after the Trooper decided to issue them during the initial encounter. (BWC 02:17-02:28). Yet the warnings, along with Mr. Paul's papers and license, remained in the Trooper's possession, now place on the center console just under the Trooper's radio.

Trooper Robles and his K-9 eventually arrived and conducted an "air sniff." (Ex. A, Report at 5). According to the report, the dog alerted; troopers moved the truck to a rest area and then to the Oldham County Sheriff's Office; and, after removing the truck's bed, they found suspected cocaine, methamphetamine, and marijuana in the fuel tank. (Ex. A, Report at 5, 8, ¶¶ 26-30). Mr. Paul was arrested and the DEA took over the case. (Ex. A, Report at 5, 8, ¶ 32).

**ARGUMENT & AUTHORITIES**

Under *Rodriguez v. United States*, a police officer must pursue the mission of a traffic stop to its completion absent new, independent reasonable suspicion to justify extending the duration of the stop. 575 U.S. 348, 354 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). A dog sniff is not part of that mission. *Id*. at 356. Any unjustified delay renders an otherwise lawful seizure unreasonable. *Id*. at 357. And because the search here was conducted without a warrant, the Government bears

the burden of proving that it was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).[4]

Here, the Trooper did *everything but* pursue the mission of the stop. He declared an intent to issue warnings from his first encounter with Mr. Paul (BWC 02:17-02:28) and then spent the rest of the encounter pursuing a search of Mr. Paul's truck: interrogating him about his family and his job, telling him that his life "doesn't make sense," asking for consent, and, when Mr. Paul exercised his right to refuse, calling for a dog and putting off the only remaining traffic task until the dog arrived. (BWC 15:47-16:20). The In doing so, the Trooper was operating on a hunch rather than reasonable suspicion. Accordingly, this Court should suppress the narcotics recovered from the truck and all other fruits of the poisonous tree.

## I. Under *Rodriguez v. United States*, the seizure of Mr. Paul became unreasonable when the trooper extended the duration of the traffic stop beyond the time needed to complete the mission of the stop without independent reasonable suspicion.

A traffic stop "may last no longer than necessary to address the traffic violation, and constitutional authority for the seizure 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 354); *see also Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). No amount of delay is "*de minimis*." *Rodriguez*, 575 U.S. at 356-57. Only "[i]f the officer develops reasonable suspicion of [additional criminal] activity in the course of the stop and

[4] Mr. Paul was driving the truck with its owner's permission. As the driver, he was seized for Fourth Amendment purposes throughout the stop and may challenge the lawfulness of that seizure and the fruits of it. *See Brendlin v. California*, 551 U.S. 249, 255-59 (2007).

before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Reyes*, 963 F.3d at 487-88 (internal quotation marks omitted).

**A. The Trooper extended the duration of the traffic stop when he abandoned his pursuit of the mission for the stop: two warnings, for speeding and missing mud flaps.**

Under the *Rodriguez* framework, an officer's "mission" comprises both the reason for the stop and the "ordinary inquiries incident to [the traffic] stop." 575 U.S. at 355. Those ordinary inquiries include checking the driver's license, checking for outstanding warrants, and inspecting the vehicle's registration and proof of insurance. *Id*. An officer may also ask questions unrelated to the stop, but only "*so long as* these unrelated questions do *not* extend the duration of the stop." *United States v. Macias*, 658 F.3d 509, 518 (5th Cir. 2011) (emphasis in original).

Here, the mission of the stop was to address a speeding violation and missing mud flaps. (BWC 01:44-01:51). And the trooper had decided, within roughly thirty seconds of collecting Mr. Paul's documents, that he would resolve both with warnings. (BWC 02:17-02:28). But contrary to what *Rodriguez* requires, the Trooper veered from that mission almost immediately. This can be seen in three places.

*First*, before any radio check appears on the recording, the trooper conducted a sustained interrogation in his patrol car. *Contrast* BWC 03:21-08:06 (interrogation), *with* BWC 10:12-10:27 (radio check). Going beyond routine questions, the Trooper asked about Mr. Paul's employment, his family relationships, his arrest history, whether he was "transporting anything illegal," whether he had been arrested for possession, and he lectured Mr. Paul that his work schedule was "not normal." (BWC 03:21-08:06).

In *Macias*, a trooper stopped a pickup registered to the driver's girlfriend and questioned the driver about his trip, his employment, and whether he had ever been in "trouble" for nearly eleven minutes before running computer checks. 658 F.3d at 518-19. Because many of the questions were unrelated to the purpose of the stop, and because the questioning delayed the resolution of the stop, the Fifth Circuit held that the trooper had unconstitutionally extended the stop. *Id*. at 518-22. That is precisely what happened here. The Trooper's interrogation, which veered into many unrelated areas identified in *Macias*, came first. The radio check was delayed and the warnings, which were promised by the Trooper twice, were never formally issued.

*Second*, when the Trooper restated his intent to give warnings at BWC 09:42, nothing remained but to complete the records checks and write two warnings. Yet the Trooper did neither. He asked more questions about the family business (BWC 11:04-11:29), monitored unrelated radio traffic about a hit-and-run elsewhere on the interstate (BWC 11:40-13:10), asked whether there were weapons, drugs, or large amounts of currency in the truck (BWC 13:42-13:50), told Mr. Paul that people "on this road" transport narcotics, and asked for consent to search. (BWC 15:19-15:53). None of that was "tied to the traffic infraction." *Rodriguez*, 575 U.S. at 354. Instead, all of it was "[o]n-scene investigation into other crimes," which "detours from that mission." *Id*. at 356.

*Third*, after Mr. Paul refused consent, the Trooper held him for the sole purpose of waiting for a dog. The trooper's own radio call states the reason for the extension: "I'm going to have a refusal … If you have an available K-9, can you send him my way, please?" (BWC 16:12-16:20). A dog sniff is "not fairly characterized as part of the officer's traffic mission." *Rodriguez*, 575 U.S. at 356. By the time dispatch reported that a canine unit was even en route, Mr. Paul had been held more than thirteen minutes past the second announcement of his warnings. *Compare* BWC 09:42-09:50, *with* 23:02-23:25.

### B. The Trooper did not have reasonable suspicion to justify the extended stop.

The Trooper's decision to abandon the mission of the stop is only excusable if he acquired independent reasonable suspicion of new criminal activity. *United States v. Santiago*, 310 F.3d 336, 341-42 (5th Cir. 2002) ("Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. In order to continue detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed.").

"[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Zuniga*, 860 F.3d 276, 281 (5th Cir. 2017). A court considers the "totality of the circumstances" to determine whether an officer has a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (cleaned up). When making such an evaluation, courts conduct an objective analysis without consideration of the investigating officer's subjective motivations. *United States v. Lopez-Moreno*, 420 F.3d 420, 432 (5th Cir. 2005). Timing matters, too: the reasonableness of the officer's suspicion "must be measured by what the officers knew before" they acted. *Florida v. J.L.*, 529 U.S. 266, 271 (2000). Facts the Trooper learned only after the detour began cannot retroactively justify it. The Fifth Circuit has considered a laundry list of factors that, in various combinations, constitute reasonable suspicion. *E.g.*, *United States v. Reyes Gonzalez*, 328 F.3d 755, 758-59 (5th Cir. 2003). No such factors, in no such combinations, exist here.

In his report, the Trooper states that "[w]hile speaking with PAUL, I observed multiple indicators of criminal activity." (Ex. A, Report at 5). The Trooper's questing and his report's narrative three areas of suspicion: (1) the truck's ownership, Kansas registration, and recent

purchase date; (2) Mr. Paul's travel plans and work schedule; and (3) Mr. Paul's criminal history. These observations do not amount to reasonable suspicion, individually or as a whole.

**1. The Truck's Purchase Date**

The Trooper's first observation has to do with the truck itself. In his report, the Trooper stated:

> I asked Mr. Paul how long he was there and he advised me that he had been there a couple of weeks. The purchase date on the 25th and the insured date on the 26th made this timeline questionable since the purchase date was five days prior to today.

(Exhibit A, Report at 7, ¶ 12).

This supposed "timeline" problem rests on Mr. Paul's hedged, offhand estimate that he had been in California "not that long, probably like a couple of weeks or something." (BWC 05:23-05:38). But the Trooper never asked Mr. Paul about the purchase date. A single follow-up question could have resolved it; the Trooper chose instead to treat it as a reason to search.

The Fifth Circuit has found no reasonable suspicion on stronger facts. In *United States v. Dortch*, the driver was not an authorized driver of the rental car, the occupants gave inconsistent answers about their relationship to the renter, and the driver's claim that he had been in Houston for two days was contradicted by rental papers showing the car had been rented the day before in Florida. 199 F.3d 193, 195-96 (5th Cir. 1999). Still, the Fifth Circuit held that continued detention to await a canine was unlawful. *Id*. at 199-200. Whatever question the truck's paperwork raised about ownership was answered by the paperwork itself, and it supplied no basis whatsoever to suspect drug trafficking. *See Dortch*, 199 F.3d at 199 ("Here, however, there was no reasonable or articulable suspicion that Dortch was trafficking in drugs. The answers he and the passenger gave, even assuming they were suspicious, did not give rise to that inference. Rather, the confusion as

to the relationship of Dortch to the proper renter of the vehicle, combined with Dortch's absence as an authorized driver on the rental agreement and the allegedly inconsistent answer about the stay in Houston, gave rise only to a reasonable suspicion that the car might have been stolen.").

**2. Mr. Paul's Travel Plans and Work Schedule**

The Trooper's second observation is that Mr. Paul's travel plans and work schedule struck him as unusual. The Trooper explained his reasoning to Mr. Paul on camera:

> I'm asking you all these questions because it doesn't, it doesn't make sense, most people, they have a job and they got to go to a job and they got a certain timeline they need to be somewhere, okay, you have no timeline … that's not normal.

(BWC 06:51-07:22).

This is not reasonable suspicion. Rather, it is the Trooper's personal expectations about how other people should structure their working lives. Mr. Paul explained that he helps with his family's trucking business and property and works when the family needs him. (BWC 04:51-05:53). Flexible work for a family business is not evidence of crime. Nor is traveling to see family after attending a funeral. Mr. Paul's account was consistent throughout: he was born in Los Angeles, his family lives in Oklahoma and Kansas, he borrowed his cousin's truck in Kansas, he went to California for a funeral, and he was headed back to his family. (BWC 03:21-08:11). The report's observation that the truck was registered "out of Wichita, Kansas not Oklahoma," (Ex. A, Report at 7, ¶ 7), reveals no inconsistency at all; Mr. Paul told the Trooper from the start that his family was in both Oklahoma and Kansas and that they owned property in Wichita. (BWC 03:43-03:47, 06:19-06:50).

The Trooper's generalization that people "on this road" transport narcotics, (BWC 15:19-15:28), likewise adds nothing. Circumstances that "describe a very large category of presumably

innocent travelers" cannot justify a seizure. *Reid v. Georgia*, 448 U.S. 438, 441 (1980). An out-of-state driver traveling on the interstate in a relative's truck to see family likely describes many motorists on Interstate 40.

**3. Mr. Paul's Criminal History**

It is well established that the presence of criminal history does not, in and of itself, amount to reasonable suspicion. *See*, *e.g.*, *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000) (no reasonable suspicion to extend the duration of a stop despite a prior arrest for crack cocaine); *Dortch*, 199 F.3d at 196 (finding no reasonable suspicion notwithstanding defendant's criminal record). Nonetheless, a suspect's criminal history can contribute to reasonable suspicion as one circumstance within the totality. *United States v. Madrigal*, 626 F. App'x 448, 452 (5th Cir. 2015) ("Awareness of a prior arrest makes suspicion more reasonable but is not enough alone to create reasonable suspicion.").

Here, this Court should give little weight to Mr. Paul's criminal history, for three reasons. *First*, the Trooper had only scant knowledge of it. Dispatch reported only that Mr. Paul had "[m]ultiple drug charges" and "firearms and assault charges" out of California. (BWC 14:15-14:42). Neither dispatch nor the trooper's report says when those charges arose, whether they resulted in convictions, or whether they were dismissed. (*See* Ex. A, Report at 7, ¶ 14).

*Second*, the timing defeats the Government's reliance on the drug charges. The radio report of those charges came after the Trooper had announced the warnings and after the delays described above were well underway. The report says only that the trooper noticed the charges "[w]hile running a check on his history," without saying when. (Ex. A, Report at 7, ¶ 14). Information learned after the extension began cannot justify it. *See J.L.*, 529 U.S. at 271.

*Third*, Mr. Paul did not conceal his record. When asked whether he had ever been arrested, he said yes and identified robbery "and stuff." (BWC 06:00-06:06). The Trooper's report characterizes the drug charges as charges "that Mr. Paul would not disclose," (Ex. A, Report at 7, ¶ 14), but the only drug-related question the trooper asked was whether Mr. Paul had been "arrested for possession." (BWC 07:34-07:41). A dispatcher's summary of unspecified "drug charges" does not establish that Mr. Paul was ever arrested for possession, much less that he lied. And even suspected misrepresentation of criminal history does not tip the balance: in *Macias*, the Government relied on the trooper's belief that the driver had misrepresented whether he had been in "trouble," and the Fifth Circuit still found no reasonable suspicion. 658 F.3d at 521.

## II. The narcotics recovered from the truck, and all other evidence obtained after the stop was unlawfully extended, are fruit of the poisonous tree.

The Fifth Circuit has repeatedly suppressed evidence discovered during a detention that outlasted its lawful justification. *See Macias*, 658 F.3d at 525. ("[A]ll evidence resulting from that search must be suppressed"); *Dortch*, 199 F.3d at 200-03 (holding that even a subsequent consent did not dissipate the taint of an unconstitutional seizure).

Every piece of evidence in this case flowed directly from the unlawful extension of the stop: the canine sniff, the alert, the search at the roadside and at the rest area, the observations of the truck's fuel system and bed, the narcotics recovered from the fuel tank at the Sheriff's Office, Mr. Paul's statements and phone activity while detained, and anything derived from them. (Ex. A, Report at 8, ¶¶ 21-31). Without the unlawful detention, there would have been no dog, no alert, and no search.

## CONCLUSION

Mr. Paul respectfully requests that this Court set this motion for an evidentiary hearing, grant the motion, and suppress all evidence gathered from the unconstitutional search and seizure,

including the narcotics recovered from the truck, all observations made during the search, all statements made by Mr. Paul after the stop was unlawfully extended, and all evidence derived from them.

Respectfully submitted,

By: */s/ DAVID M. GUINN JR.*
Bar No. 08599100
HURLEY, GUINN, SINGH &
VONGONTEN
1805 13th Street
Lubbock, Texas 79401
Tel: (806) 771-0700
Fax: (806) 763-8199
E-mail: david@hurleyguinn.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I certify that on October 12th, 2026, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a “Notice of Electronic Filing” to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Anna Marie Bell
Assistant U. S. Attorney
500 South Taylor Street Suite 300
Amarillo, Texas, 79101-2446
Anna.bell@doj.gov